RESOLUTION TRUST CORPORATION,
Plaintiff,

v.

O'BEAR, OVERHOLSER, SMITH & HUFFER, an Indiana partnership, d/b/a Rider, John J. Barber, Opal F. Bowman, William H. Bradshaw, John P. Erickson, Dean A. Hudson, Carl D. Overholser, Fred R. Rodkey, and Raymond J. Todd, Defendants.

Civ. No. H 83–164.

United States District Court,
N.D. Indiana,
Hammond Division.

Dec. 14, 1993.

William A. Spence, Beverly L. Bailey, Freeborn and Peters, Steven A. Ramirez, Robinson Curley and Clayton, Rhiannon E. Schmieg, Chicago, for plaintiff.

Richard A. Mayer, Spangler Jennings and Dougherty P.C., Merrillville, IN, for defendant Obear Overholser Smith and Huffer.

George L. Hanna, Hanna Gerde and Burns, Lafayette, IN, James H. Falk, Jr., Falk Law Firm, Washington, DC, for defendants John J. Barber, Opal F. Bowman, John P. Erickson, Carl D. Overholser, Fred R. Rodkey, Raymond J. Todd.

David A. Rosenthal, Rosenthal Greives and O'Bryan, Lafayette, IN, for defendant William H. Bradshaw.

Christine A. DeSanctis, Robert E. Poynter, Bennett Boehning Poynter and Clary, Lafayette, IN, for defendant Dean A. Hudson.

### *MEMORANDUM and ORDER*

MOODY, District Judge.

On June 8, 1990, the Resolution Trust Corporation ["RTC"] was appointed receiver for Hometown Federal Savings Bank ["Hometown"]. *See* 12 U.S.C. § 1821. In that capacity, RTC has brought this action, alleging ten counts against various defendants, all either former Hometown directors or counsel to Hometown's former board of directors. The matter is now before the court upon certain of these defendants' motions to dis-

miss counts I–III and VII–X of RTC's complaint pursuant to FED.R.CIV.P. 12(b)(6).[1] The motions to dismiss are hereby **GRANTED** in part, **DENIED** in part.

 Rule 12(b)(6) permits defendants to challenge the sufficiency of a complaint. Accordingly, any discussion of Rule 12(b)(6) motions must begin with the allegations of the complaint. These are to be construed "liberally," and "in the light most favorable to the plaintiff." *Resolution Trust Corporation v. Gallagher*, 800 F.Supp. 595, 598 (N.D.Ill.1992). No count of a complaint should be dismissed "unless it appears beyond a doubt that the plaintiff can prove no set of facts in support of his [or her] claim which would entitle him [or her] to relief." *See Conley v. Gibson*, 355 U.S. 41, 45–46, 78 S.Ct. 99, 102, 2 L.Ed.2d 80 (1957).

RTC's complaint concerns five loans that Hometown became involved with over an eight month period between June, 1983 and February, 1984. These loans involved investment outside the geographic and risk boundaries within which Hometown had previously operated. When the higher risk involved was realized, Hometown lost money on the loans. RTC, acting in its capacity as receiver, and under the authority of the Financial Institutions Reform, Recovery, and Enforcement Act ["FIRREA"], *see* 12 U.S.C. §§ 1821(d) & (k), now seeks to recover that loss from those it deems responsible: (1) in counts I–III, Hometown's former board of directors; (2) in counts IV–VI, Hometown's former counsel; and, (3) in counts VII–X, defendant Todd, in his capacity as appraiser for Hometown. Defendants' motions attack counts I–III and VII–X. The court takes up their arguments in turn.

## I. Counts I–III.

### A. The allegations.

Counts I–III seek damages against Hometown's former board of directors, *i.e.* defen-

dants Barber, Bowman, Bradshaw, Erickson, Hudson, Overholser, Rodkey and Todd ["the defendants"], for their role in involving Hometown with the five high-risk loans at issue. The complaint asserts generally that:

> As directors of Hometown, [these] defendants ... owed Hometown the fiduciary duty to use reasonable care, skill and diligence in the performance of their duties....

Complaint ¶ 20. The complaint defines the defendants' duties as including responsibility for conducting Hometown's affairs in compliance with the law while executing prudent lending, investment, and underwriting policies and exercising "reasonable business judgment with respect to all facts which a reasonable investigation would have disclosed." Complaint ¶ 20. Counts I–III all concern the defendants' alleged derogation of these duties. All three counts refer to the defendants' alleged failure:

> ... (a) to obtain complete and reliable credit information on the borrowers and guarantors in accordance with Hometown's lending policies and safe and sound banking practices; (b) to obtain independent appraisals (required by federal regulations) on the projects being relied on for the repayment of loans; (c) to obtain accurate and unbiased information on the real estate markets in the areas for which the loans were made; (d) to ascertain whether these loans violated the federal loans-to-one-borrower regulations; and (e) to hire consultants to provide the board with needed information and guidance about the new type of lending activity.

Complaint ¶ 50.

Count I states that these failures amount to negligence and/or gross negligence with regard to the defendants' duty to act "with reasonable skill, care, and diligence" in carrying out their responsibilities. Count II

---

**1.** On August 12, 1993, Defendants' John Barber, Opal Bowman, John Erickson, Carl Overholser, Fred Rodkey and Raymond Todd moved the court to dismiss counts I–III and VII–X. On August 13, 1993, defendant William Bradshaw moved the court to dismiss counts I–III. On October 18, 1993, Bradshaw moved to join the other defendants' motion. Bradshaw's October 18 motion is hereby **GRANTED**. On October 12, 1993, defendant Dean Hudson also moved to join his co-defendants' motion. That motion is hereby **GRANTED**. On October 21, 1993, Bradshaw filed a supplemental motion to dismiss. All motions are **ORDERED** consolidated for the purposes of this Memorandum and Order.

alleges that the defendants' failures breached "a fiduciary duty in the management, supervision, and direction of Hometown." Count III alleges that the defendants' failures breached alleged contracts. All three counts allege that the defendants' breaches of duty caused Hometown to suffer "substantial damage and loss."

The court first discusses whether counts I–III may state claims under Indiana law; the court then turns to whether they state claims under federal law.

### B. *State-law claims.*

Counts I–III all allege that the defendants breached their duties as directors of Hometown. All three counts can be construed to allege claims under Indiana common law. Determining whether counts I–III state state-law claims for which relief can be granted therefore requires an answer to whether Congress, through its enactment of 12 U.S.C. § 1821(k), has pre-empted state common law claims brought by RTC against former officers and directors of federally insured financial institutions.

■ The Seventh Circuit recently held that § 1821(k) pre-empts federal common law with regard to claims like those alleged in counts I–III. *Resolution Trust Corp. v. Gallagher,* 10 F.3d 416, 423–24, (7th Cir. 1993) ["*Gallagher II* "]. *Gallagher II* concluded that § 1821(k) established a "gross negligence" standard for director liability under federal law. *Id.* The Seventh Circuit was not presented with, however, and so did not reach, the question of whether § 1821(k) also pre-empts state common-law claims. *Id.* This court now determines that § 1821(k) does pre-empt RTC's state-law claims.

There is authority contrary to the court's conclusion. In fact, the two courts of appeals that have considered whether § 1821(k) pre-empts state common law each concluded that it did not. See *Federal Deposit Ins. Corp. v. McSweeney,* 976 F.2d 532, 537 (9th Cir.1992); *Federal Deposit Ins. Corp. v. Canfield,* 967 F.2d 443, 446 (10th Cir.1992). Further, *Canfield* noted that "[t]he district courts that have considered this question are split, but a clear majority agrees with the FDIC's inter-

pretation," *i.e.,* that state common law is not pre-empted by § 1821(k). 967 F.2d at 446 n. 6. Nonetheless, because *McSweeney, Canfield,* and the district court decisions cited in *Canfield* are founded on premises rejected by the Seventh Circuit in *Gallagher II,* the court does not follow those decisions.

"The starting point for the interpretation of a statute 'is the language of the statute itself. Absent a clearly expressed legislative intention to the contrary, that language must ordinarily be regarded as conclusive.'" *Kaiser Aluminum & Chem. Corp. v. Bonjorno,* 494 U.S. 827, 835, 110 S.Ct. 1570, 1575, 108 L.Ed.2d 842 (1990) (citation omitted). As relevant to this discussion, § 1821(k) provides that:

- "A director or officer of an insured depository institution *may* be held personally liable . . . for gross negligence," and,

- "*Nothing in this paragraph shall impair or affect any right of the [RTC] under other applicable laws.*"

12 U.S.C. § 1821(k) (Emphasis added.) The cases holding that § 1821(k) does not pre-empt state-law claims do so based upon their interpretation of the plain meaning of this language. See, e.g., *McSweeney,* 976 F.2d at 537–38; *Canfield,* 967 F.2d at 446–47. These courts conclude that the first clause's use of "may", rather than "may only", evinces congressional intent that § 1821(k) be "non-limiting," that is, § 1821(k) provides a non-exclusive option for RTC. *See McSweeney,* 976 F.2d at 537–38. They buttress this argument with reference to the second, "savings," clause, arguing that state common law actions are among the "other applicable laws" not to be affected by the provision. *See id.* at 538.

*Gallagher II* rejected these interpretations of the "plain language" of § 1821(k). Regarding the use of "may", the court stated that, " '[r]ead in context, the word 'may' refers to the right of the [RTC] to bring an action under this section. 'May' cannot reasonably be read to qualify the gross negligence standard and is therefore irrelevant to the substance of the provision.'" *Gallagher II,* 10 F.3d at 419 (quoting *Canfield,* 967 F.2d at 450 n. 4 (Borby, J., dissenting)). Thus, the Seventh Circuit read the first clause to

state simply that the RTC "may", as a matter of right, bring an action under § 1821(k).

Regarding the savings clause, *Gallagher II* rejected a construction identical to that adopted by *Canfield* and *McSweeney*, concluding that

> [a] better reading of the savings clause is that it was drafted to preserve the RTC's ability to take other regulatory actions based on simple negligence. For example, it preserves the RTC's power to remove directors for simple negligence and its power to issue "cease and desist" orders in cases of simple negligence.

*Id.* at 420 (citing 12 U.S.C. §§ 1818(b)–(g)). The court reasoned that "[i]t is illogical that Congress intended in one sentence to establish a gross negligence standard by allowing actions under *federal common law for simple negligence* and in the next sentence to eviscerate that standard by allowing actions under federal common law for simple negligence." *Id.*

Turning to FIRREA's legislative history, *Gallagher II* found " 'no clearly expressed legislative intention' contrary to our interpretation of the plain language of § 1821(k)." *Id.* It cited to the Conference Report—"the most persuasive evidence of congressional intent besides the statute itself"—which states:

> [Section 1821(k) ] preempts State law with respect to claims brought by the [RTC] in any capacity against officers or directors of an insured depository institution. The preemption allows the [RTC] to pursue claims for gross negligence or any conduct that demonstrates a greater disregard of a duty of care, including intentional tortious conduct.

*Id.* (quoting H.R.Conf.Rep. No. 222, 101st Cong., 1st Sess. 393, 398 (1989), *reprinted in* 1989 U.S.C.C.A.N. 432, 437). The court drew from this statement that "Congress intended for officers and directors to be held liable 'for gross negligence or any conduct that demonstrates a greater disregard of a duty of care,' not simple negligence." *Id.* (citation omitted).

The court then related portions of the debate on the Senate version of the bill. Originally, that version would have allowed claims " 'for any cause of action available at common law, including ... negligence ... [and breach of] fiduciary duty.' " *Id.* at 421 (citation omitted). This language was removed after Senator Heflin raised concerns about federally insured institutions being " 'able to attract strong and capable individuals as directors and officers.' " *Id.* (citation omitted).

Finally, the court noted the rejection of two proposed post-enactment amendments, which provided that § 1821(k) not impair rights under state or federal causes of action based upon simple negligence. *Id.* at 422–23 (noting that post-enactment amendments not accorded same weight as contemporaneous legislative history).

Having construed the "plain language" of § 1821(k), and having found that "the most persuasive forms of legislative history are consistent" with that construction, *Gallagher II* held that, consistent with *City of Milwaukee v. Illinois,* 451 U.S. 304, 101 S.Ct. 1784, 68 L.Ed.2d 114 (1981), § 1821(k) pre-empts federal common-law.

This court must now consider whether § 1821(k) also pre-empts state common law and, notwithstanding the Seventh Circuit's statement that "[*Gallagher II* ] does not necessarily dictate a finding that § 1821(k) pre-empts state law," *id.* at .424, this court concludes that the court of appeals' reasoning in *Gallagher II* does, in fact, lead inexorably to that result.

*Gallagher II* noted that, under *City of Milwaukee,* "because of federalism concerns, greater evidence of congressional intent is required to pre-empt state law than federal common law." 10 F.3d at 424. The Supreme Court has fleshed out this higher standard:

> In considering the [question of whether federal statutory law pre-empts state law], "we start with the assumption that the historic police powers of the States were not to be superseded by the Federal Act unless that was the clear and manifest purpose of Congress." While we have not hesitated to find pre-emption of state law, whether express or implied, when Congress has so indicated, or when enforcement of state regulations would impair

'federal superintendence of the field,' our analysis has included 'due regard for the presuppositions of our embracing federal system, including the principle of diffusion of power not as a matter of doctrinaire localism but as a promoter of democracy.' *City of Milwaukee*, 451 U.S. 304, 316, 101 S.Ct. 1784, 1792, 68 L.Ed.2d 114 (1981) (citations omitted). *City of Milwaukee* thus provides for two alternative inquiries into: (1) congressional intent, and, (2) whether Congress has elected to superintend the field and the effect of enforcement of state law on that superintendence. Section 1821(k) pre-empts state common law claims under either analysis.

■ The plain language of a statute is the strongest evidence of congressional intent. *See Bonjorno*, 494 U.S. at 835, 110 S.Ct. at 1575. That the question presented is preemption of state, rather than federal, simple negligence claims presents no reason to deviate from *Gallagher II*'s reading of the plain language of § 1821(k). Particularly with regard to the savings clause, the newly created gross negligence cause of action would be equally "eviscerated" by a clause that allows simple negligence claims whether those simple negligence claims are founded on state or federal common law.

Likewise, the legislative history relied upon by *Gallagher II* applies equally, if not more so, to whether Congress intended § 1821(k) to pre-empt state common law claims. The Conference Report, for example, specifically notes that § 1821(k) pre-empts state law—it does not mention federal common law. Further, Senator Heflin's concern that federally insured financial institutions be able to attract "strong and capable individuals," the inference being that they may not attract those persons if directorship subjects one to RTC actions based on simple negligence, is equally *apropos* whether those potential actions are founded on federal or state common law. Finally, the rejected post-enactment amendments specifically attempted to preserve both federal *and* state causes of action. As with any foray into the morass of legislative history, fodder may be found for the argument that § 1821(k) was not intended to pre-empt state common law.

The stronger argument, however, clearly favors pre-emption.

*City of Milwaukee*'s alternative line of inquiry, into federal superintendence of the field and whether "enforcement of state regulations would impair 'federal superintendence of the field,'" 451 U.S. at 316, 101 S.Ct. at 1792, also favors a finding that § 1821(k) pre-empts state common law. Congress has chosen to closely superintend the operation and closure of federally insured financial institutions. *Gallagher II* outlined the breadth of this superintendence, finding the "establishment of a comprehensive regulatory scheme and supervision by an expert agency." 10 F.3d at 423. Not only is there "'no room to improve on that program with federal common law," *Id.* at 423 (citation omitted), but this court finds that it would impair the operation of that superintendence to allow state-law claims of simple negligence by the RTC against directors or former directors of federally-insured savings institutions. That impediment would work by effectively reading § 1821(k)'s gross negligence standard out of existence in states that apply simple negligence.

■ Congress has undisputed power to determine the incentives and potential liabilities to being a director of a federally insured savings institution. It exercised that power with § 1821(k), and stated as much in the Conference Report. See also *Gaff v. Federal Deposit Ins. Corp.*, 919 F.2d 384, 391 (6th Cir.1990) (stating, with reference to § 1821(k), that "Congress has clearly indicated that the liability of officers and directors of a bank are determined under federal law" exclusively). This incursion into the states' historic police power is limited in its application to federally insured institutions. The court therefore finds, based upon *Gallagher II*'s construction of the statute and this court's application of *City of Milwaukee*, that any state-law claims pleaded by RTC in counts I–III are pre-empted by federal statute.

### C. Federal claims.
#### 1. Count III.

■ Count III alleges breaches of contract. It states that

[t]here were implied or express contracts between Hometown and the defendants to faithfully, properly and with due care discharge their duties as directors, officers and/or employees in return for the salaries and/or directors' fees which they were paid.

Complaint ¶ 77. This allegation dovetails with the complaint's earlier statement that when the defendants "agreed to serve as directors of Hometown, they understood their duties to include adhering to safe and sound business practices." Complaint ¶ 21.

In *Gallagher*, the district court dismissed a RTC breach of contract claim based on former bank directors' alleged failure to execute their contractual duties with due care. 800 F.Supp. at 603. *Gallagher* concluded that RTC's contract allegation was "simply a statement of the defendants' fiduciary duties to the institution rather than a claim for breach of contract." *Id.* That holding is consistent with other district courts faced with similar claims. *See, e.g., Federal Deposit Insurance Corp. v. Mintz*, 816 F.Supp. 1541, 1546–47 (S.D.Fla.1993) (dismissing breach of contract claim against former bank directors because the court "disagree[d] that this action lies in contract"); *Federal Deposit Insurance Corp. v. Dannen*, 747 F.Supp. 1357, 1362 (W.D.Mo.1990) (dismissing breach of contract claim based on breach of fiduciary duty because " '[a] fiduciary who commits a breach of his [or her] duty is guilty of tortious conduct,' " not breach of contract) (quoting RESTATEMENT (SECOND) TORTS § 874 comment B (1979)); *but see Dannen*, 747 F.Supp. at 1362 (citing relevant contrary case-law).

These cases recognize that the gravamen of claims like count III is that the defendants' failed to exercise "due care" in executing their responsibilities as directors. In the wake of *Gallagher II*'s holding that

§ 1821(k) occupies the field *vis-a-vis* federal claims by RTC based on the conduct of former directors and officers of their duties at federally insured financial institutions, count III is pre-empted by FIRREA. *See* 10 F.3d at 423–24. Accordingly, count III is hereby ordered dismissed with prejudice.[2]

### 2. *Count II.*

■ Count II alleges that the defendants' failure with regard to their duties at Hometown "constitutes one or more breaches of fiduciary duty by defendants...." Complaint ¶ 74. This claim also does not state a claim from which relief can be had because it is pre-empted by § 1821(k). *See Gallagher II*, 10 F.3d at 423–24; *see also Gallagher*, 800 F.Supp. at 602 (dismissing fiduciary duty claim because fiduciary's standard of care falls below gross negligence standard stated in § 1821(k)). Accordingly, Count II is dismissed with prejudice.

### 3. *Count I.*

■ Count I alleges that the defendants' failures "constitute[ ] one or more acts of negligence and/or gross negligence" and that "[a]s a direct and proximate result of the defendants' negligence and/or gross negligence, Hometown suffered substantial damage or loss." Complaint ¶¶ 66 & 69. As discussed, any federal common law claim for simple negligence is pre-empted by FIRREA. *See Gallagher II*, 10 F.3d at 423–24. RTC's claim of gross negligence, however, does state a claim under § 1821(k). To explain why, the court first takes up the defendants' challenge to the sufficiency of count I's pleading. The court then considers defendants' statute of limitations argument in the context of this remaining count.

#### a. *Sufficiency of the complaint.*

■ The inquiry with regard to the sufficiency of RTC's complaint is limited to

---

**2.** RTC argues that *Gallagher* "involved no allegation, as here asserted, that the defendants agreed to assume specific contractual duties different from common law duties." RTC does not point to, however, and the court does not find, such an allegation of heightened contractual duty. The complaint in *Gallagher* alleged that

> there were express or implied contracts between [the bank] and the defendants requiring

defendants to faithfully, properly, and with due care discharge their duties as directors, officers, and/or employees in return for the salaries and/or directors' fees which they were paid.

*Id.* This allegation is substantially identical to RTC's allegation in count III in this case.

whether it is "beyond doubt," accepting the complaint as true and drawing all inferences in favor of RTC, that RTC could not establish that the defendants were grossly negligent. *See Gallagher*, 800 F.Supp. at 598.

 "Gross negligence," under FIR-REA, is "defined and determined under applicable State law." 12 U.S.C. § 1821(k). The applicable state law in this case is Indiana's. Indiana does not generally recognize degrees of negligence. *See South Eastern Indiana Natural Gas Co. v. Ingram*, 617 N.E.2d 943, 953 (Ind.Ct.App.1993). The Indiana courts do, however, discuss gross negligence in cases that concern punitive damages for breach of contract. *See, e.g., Hibschman Pontiac, Inc. v. Batchelor*, 266 Ind. 310, 362 N.E.2d 845, 847–48 (1977); *A.B.C. Home & Real Estate Inspection, Inc. v. Plummer*, 500 N.E.2d 1257, 1263 (Ind.Ct. App.1986); *Nationwide Mut. Ins. Co. v. Neville*, 434 N.E.2d 585, 593 (Ind.Ct.App.1982). Such punitive damages are available when "the elements of fraud, malice, gross negligence or oppression *mingle* in the controversy." *Hibschman Pontiac, Inc.*, 362 N.E.2d at 847–48 (Emphasis in original.) Notwithstanding the place of "gross negligence" in this standard, the term has not been expressly construed.

Thus, in *The Prudential Ins. Co. v. Executive Estates, Inc.*, 174 Ind.App. 674, 369 N.E.2d 1117, 1132 (1977), the Court of Appeals of Indiana stated that "gross negligence as such ... has not been defined ...,, but it is reasonable to assume that it refers to the same kind of oppressive conduct symbolized by fraud or malice." *Prudential Ins.* emphasized the "bad faith" component of fraud and malice while drawing this equation. *Id.* *Neville* followed *Prudential Ins.*, stressing the intentional quality of the fraudulent or malicious conduct with which gross negligence is paired. 434 N.E.2d at 593.

 However strongly these cases imply that grossly negligent conduct must be "intentional", the court recalls that gross negligence "differs from ordinary negligence only in degree, and not in kind." W. PAGE KEETON ET AL., PROSSER AND KEETON ON THE LAW OF TORTS § 34, at 212 (5th ed. 1984). Thus, *Plummer*—a rare punitive-damages case that treats gross negligence distinct from fraud or malice-found gross negligence where the defendant's behavior constituted "clearly negligent acts committed with complete disregard for the consequences." 500 N.E.2d at 1263. Similarly, in the fifth edition of BLACK'S LAW DICTIONARY, recently used by the Indiana Supreme Court to define "gross negligence" in a statutory context, "gross negligence" is defined as intentionally failing to perform "a manifest duty in reckless disregard of the consequences." See *Stump v. Commercial Union*, 601 N.E.2d 327, 332 n. 5 (Ind.1992).[3]

 From this less-than-clear case law, the court concludes that gross negligence, for the purposes of this lawsuit, requires that the defendants, in the face of a manifest duty, acted with reckless disregard for the consequences. To the extent Indiana law requires "intent," the court follows *Plummer* and will infer the requisite intent upon RTC's showing that the defendants' actions were "plainly negligent." *See* 500 N.E.2d at 1263.

 Applying this standard, count I alleges that the defendants acted in the face of a duty that was arguably manifest. The court cannot conclude, beyond doubt, that, assuming the failures enumerated in paragraph 50 of the complaint, *supra*, the defendants did not act with reckless disregard of the consequences for Hometown of their actions. This states a claim of gross negligence under 12 U.S.C. § 1821(k) in Indiana.

---

**3.** Prosser states that "it is still true that most courts consider that 'gross negligence falls short of a reckless disregard of the consequences.'" W. PAGE KEETON ET AL., PROSSER AND KEETON ON THE LAW OF TORTS § 34, at 212 (5th ed. 1984). To the extent that Indiana courts suggest reckless disregard of the consequences is part-and-parcel of gross negligence, *see, e.g., Stump*, 601 N.E.2d at 332 n. 5; *Plummer*, 500 N.E.2d at 1263, they evince a particularly high threshold for gross negligence.

The court emphasizes that *Stump* "assumed" the BLACK'S LAW DICTIONARY definition of "gross negligence" for use in answering the question certified to it there; the court did not, as RTC suggests, adopt this definition as Indiana law in any general sense. *Id.*

The defendants also argue that RTC has failed to adequately plead that the defendants' actions caused Hometown's losses. RTC's allegations with regard to causation are admittedly conclusory; however, more specificity is not required. The liberal pleading requirements of the Federal Rules of Civil Procedure allow "litigants [to] plead generally and discover the precise factual basis for their claim through equally liberal pretrial discovery procedures." *Morrison v. City of Baton Rouge*, 761 F.2d 242, 244 (5th Cir.1985). Those same liberal discovery procedures are available to opposing parties, like the defendants, who seek to discover the factual basis for claims against them. Certainly, it is not beyond doubt that defendants' alleged conduct caused Hometown's losses. Count I adequately pleads causation.

### b. *The limitations period.*

Defendants also challenge counts I–III as time-barred. A complaint does not state a claim for which relief can be granted if it states a claim for which the limitations period has run. The court takes up the defendants' statute of limitations argument with regard to the only remaining claim, *i.e.,* gross negligence under 12 U.S.C. § 1821(k).

FIRREA clearly expresses the limitations period for actions brought under its auspices:

> [T]he applicable statute of limitations with regard to any action brought by [RTC] as conservator or receiver shall be—
>
> ....
>
> (ii) in the case of any tort claim, ...—
> (I) the 3–year period beginning on the date the claim accrues....

12 U.S.C. § 1821(d)(14)(A). This period begins to run on the later of "the date on which the cause of action accrues" or the date RTC was appointed receiver. 12 U.S.C. § 1821(d)(14)(B). RTC was appointed receiver of Hometown on June 8, 1990. RTC filed its complaint on June 4, 1993. RTC's complaint is therefore timely.

The defendants argue, correctly, that FIRREA does not revive stale state-law claims. *See Federal Insurance Deposit Corp. v. Dawson*, 4 F.3d 1303, 1306–1307 (5th Cir.1993) (citing cases in support). Count I does not, however, as discussed, present a state-law claim to be revived. Rather, it states a federal, statutory cause of action by which the RTC may pursue former directors and officers. *See Gallagher II*, 10 F.3d at 419 *and* 12 U.S.C. § 1821(k). Such claims are significantly distinct from claims the RTC acquires as successor in interest. *See* 12 U.S.C. § 1821(d)(2)(A) ("The [RTC] shall, as conservator or receiver, and by operation of law, succeed to all rights ... of the insured depository institution...."). *Dawson* mandates that district courts "first determine whether the claims being brought ... were viable under the applicable state statute of limitations at the time the [RTC] was appointed receiver," 4 F.3d at 1306. That mandate presumes that "the [RTC] is merely acquiring the claims held by the failed bank." *See id.* at 1309. That premise, and *Dawson*'s holding, is clearly inapposite to § 1821(k) claims. For claims created by federal statute, there simply is not an "applicable state statute of limitations" to consider.[4]

---

4. Defendants' also argue that, for statute of limitations purposes, "FIRREA does not apply retroactively." FIRREA was passed in August, 1989. *See* Pub.L. No. 101–73, 1989 U.S.C.C.A.N. (103 Stat.) 183, 553. The acts on which count I is premised were done in 1983 and 1984.

The United States Court of Appeals for the Seventh Circuit has already addressed the question of retroactive application of FIRREA. See *Federal Deposit Insurance Corp. v. Wright*, 942 F.2d 1089, 1095 (7th Cir.1991) (discussing retroactive application of 18 U.S.C. § 1823(e)). The court applied the Supreme Court's rule in *Bradley v. Richmond School Board*, 416 U.S. 696, 94 S.Ct. 2006, 40 L.Ed.2d 476 (1974) that "established a presumption of retroactivity." *Wright*, 942 F.2d at 1095. The court examined "FIRREA

and its legislative history for any indication that Congress intended FIRREA to apply only prospectively." *Id.* It concluded that, in fact, "retroactive application of FIRREA would further ... congressional intent." *Id.* at 1096. Furthermore, *Wright* found no threat of "manifest injustice" on the facts before the court there. *Id.* (where manifest injustice, presumption favoring retroactive application is overcome). Defendants have not demonstrated that they will suffer a "manifest injustice" by application of §§ 1821(d)(14) and 1821(k) to this case. Neither does the court see the manifest injustice in Congress' creation of an extended limitations for RTC to bring actions premised on gross negligence.

Accordingly, the court concludes that count I states a valid claim under § 1821(k).

## II. *Counts VII–X.*

### A. *The allegations.*

Defendant Todd was chairman of Hometown's board of directors until 1986. Complaint ¶ 58. RTC alleges that Todd was also retained by the board as Hometown's "chief appraiser" at the time the loans at issue in this lawsuit were approved of by the board. Complaint ¶ 58. "As consideration for his job duties [as chief appraiser], Todd could refer as much work as he wanted to his own appraisal firm." Complaint ¶ 59. As chief appraiser, "it was Todd's duty to review the appraisals submitted for the five ... loans" and to "advise the board of directors whether these appraisals were appropriate." Todd did review these appraisals, even visiting the sites of three of the proposed developments. Complaint ¶ 60. Afterwards, knowing that the board relied upon his appraisals, he advised the board that the loans were appropriate and/or he failed to advise the board the appraisals failed to meet the requirements of either federal regulations or Hometown's own policies. Complaint ¶¶ 61–62. The appraisals also violated federal regulations. Complaint ¶ 63. Counts VII–X allege, respectively, professional malpractice, negligent misrepresentation, breach of contract, and negligent performance of undertaking to render services against Todd in connection to these allegations. Todd makes numerous challenges to counts VII–X pursuant to Rule 12(b)(6).

■■■ At the outset, the court notes that counts VII–X do not allege causes of action against Todd in his capacity as chairman of the board, or as a board member or officer of Hometown. Rather, they attack Todd's performance as chief appraiser. Accordingly, these counts accrue to RTC under 12 U.S.C. § 1821(d)(2)(A), which provides that RTC, upon conservatorship or receivership, shall succeed to all of the rights of the insured depository institution. That Todd wore two

hats at Hometown, as both director and chief appraiser, does not bring counts VII–X under the auspices of § 1821(k). Neither party has shown the court, and the court has not uncovered, any instance where § 1821(k) has been applied to a claim against a director for that director's conduct in a capacity other than his or her directorship. Counts VII–X, therefore, will be treated as state-law claims to which RTC has succeeded.

In this context, the court takes up Todd's arguments that counts VII–X fail to state claims upon which RTC can have relief. The court first considers Todd's challenges to each individual count. It then turns to his general argument that all of the counts are time-barred.

### B. *Count VII.*

■■■ Count VII alleges that Todd breached the duty of care he owed Hometown "to properly review all of the institution's appraisals performed by outside appraisers." Complaint ¶¶ 96–97. Citing Todd's alleged failure to do so, it states that "[a]s a direct and proximate result of Todd's breaches of duty, Hometown suffered substantial damage and loss." Complaint ¶ 97–98. Given the liberal notice pleading approach adopted by the Federal Rules of Civil Procedure, *see Morrison,* 761 F.2d at 244 (federal rules allow litigants to plead generally), this is sufficient to state a claim in tort: Todd had a duty, he breached that duty, and his breach proximately caused Hometown damages, *see Webb v. Jarvis,* 575 N.E.2d 992, 995 (Ind. 1991) (elements of tort are: (1) existence of a duty, (2) breach of that duty, (3) injury proximately caused by that breach of duty).[5]

### C. *Count VIII.*

■■■ Count VIII alleges negligent misrepresentation by Todd. It states that Todd was compensated for his role as chief appraiser and that "he supplied and/or conveyed inaccurate information to the board ... for their guidance in making decisions about the five ... loans." Complaint ¶ 100. It alleges that "Todd failed to exercise rea-

---

5. Todd's primary challenge to count VII is that it is time-barred. He also raises this challenge to counts VIII–X. The limitations argument is dis-

cussed below with regard to all otherwise viable counts.

sonable care or competence in obtaining the information about the appraisals" and that "he failed to advise the board that the appraisals did not comply with federal regulations ... nor with Hometown's own commercial lending policies." Complaint ¶ 102. As a result, it alleges that Hometown suffered substantial damage. Complaint ¶ 103. Todd argues that count VIII cannot state a claim for which relief can be granted because Indiana does not recognize the tort of negligent misrepresentation.

▇ "'[A] federal court must apply the state law as declared by the highest state court or otherwise by the intermediate appellate court of the state.'" *Kutsugeras v. Avco Corp.,* 973 F.2d 1341, 1346 (7th Cir.1992) (citation omitted). Indiana "has declined to recognize the tort of negligent misrepresentation in the context of rendering professional opinions." *Emmons v. Brown,* 600 N.E.2d 133, 135 (Ind.Ct.App.1992). As the most recent statement of Indiana law by an Indiana court with regard to the status of the tort of negligent misrepresentation, *Emmons* is authoritative. See also, e.g., *United Leaseshares v. Citizens Bank & Trust Co.,* 470 N.E.2d 1383, 1390 (Ind.Ct.App.1984) ("Although negligent misrepresentation may not be a recognized theory of recovery...."); *Eby v. York Division, Borg–Warner,* 455 N.E.2d 623, 629 (Ind.Ct.App.1983) (re-affirming prior holding that "Indiana does not recognize the tort of negligent misrepresentation."); *Essex v. Ryan,* 446 N.E.2d 368, 371 (Ind.Ct.App.1983) ("[I]t has been held that Indiana does not recognize the tort of negligent misrepresentation").

The basis for Indiana's rejection of the negligent misrepresentation tort in the context of the rendering of professional opinions is "[t]he specter of confusing professional opinions (malpractice) with simple misrepresentations made in the course of one's professional activities." *Eby,* 455 N.E.2d at 629; see also *Nicoll v. Community State Bank,* 529 N.E.2d 386, 391 (Ind.Ct.App.1988) (citing *Eby* ). Thus, *Essex* treated the plaintiff's negligent misrepresentation claim as one for negligent breach of a contract to perform professional services because surveying, the professional service involved there, by its

nature, required making representations. See 446 N.E.2d at 370–71.

As chief appraiser, Todd's job was to represent to the Board whether the appraisals submitted for the five subject loans were properly done. Whether Todd was negligent in so representing can only be answered with regard to the standard of care for appraisers hired in this capacity. Count VIII, accordingly, does state a claim: for professional negligence. RTC has pleaded professional negligence in count VII. Count VIII is therefore stricken as redundant. *See* FED. R.CIV.P. 12(f) ("[U]pon the court's own initiative at any time, the court may order stricken ... any redundant ... matter.")

### D. *Count IX.*

▇ Count IX alleges breach of contract by Todd. It states that "[t]here were implied or express contracts between Hometown and Todd requiring Todd to faithfully, properly and with due care discharge his duties as chief appraiser in return for the salary and/or fees he was paid." Complaint ¶ 105. It alleges that Todd breached that contract by performing as described above, and that Hometown suffered damages as a proximate result. Complaint ¶¶ 106–107.

RTC has sufficiently pleaded the basic elements of a contract claim. *See Strong v. Commercial Carpet Co., Inc.,* 163 Ind.App. 145, 322 N.E.2d 387, 390–91 (1975) (essential elements of contract claim are: (1) existence of a contract, (2) performance by complaining party, (3) defective performance or non-performance by defendant, and (4) damages arising from breach). Although Todd argues that count IX merely restates RTC's professional negligence claim, "it is axiomatic that one who contracts to perform services may commit both a breach of contract and the tort of negligence when he negligently fails to perform in a workmanlike manner." *Essex,* 446 N.E.2d at 370. Count IX, therefore, states a claim for breach of contract.

### E. *Count X.*

▇ Count X alleges negligent performance of undertaking to render services by Todd. It states that "Todd undertook to

render services for Hometown which he should have recognized were necessary for the protection of Hometown's assets." Complaint ¶ 109. It goes on to state that "he failed to exercise reasonable care in reviewing the appraisals for the five ... loans" and that "[a]s a direct and proximate result of Todd's negligence and/or gross negligence, Hometown suffered substantial damage and loss."

■ Count X is apparently fashioned after RESTATEMENT (SECOND) OF TORTS § 323 (1965). Section 323 provides that:

> One who undertakes, gratuitously or for consideration, to render services to another which he should recognize as necessary for the protection of the other's person or things, is subject to liability to the other for the physical harm resulting from his failure to exercise reasonable care to perform his undertaking, if
>
> . . . .
>
> (b) the harm is suffered because of the other's reliance upon the undertaking.

Section 323, and its counterpart § 324A, "parallels Indiana's doctrine of assumed duty." *See Harper v. Guarantee Auto Stores,* 533 N.E.2d 1258, 1263 n. 4 (Ind.Ct. App.1989) (citing to both §§ 323 and 324A while discussing § 324A, which describes a § 323–type duty owed third parties). Indiana has adopted § 324A's formulation of the doctrine of assumed duty in the context of framing a correct jury instruction as to duty in negligence cases. *See id.* at 1261–63; *Baker v. Midland–Ross Corp.,* 508 N.E.2d 32, 34 (Ind.Ct.App.1987). Duty is, however, only one element of a tort. *See Webb,* 575 N.E.2d at 995. Likewise, the doctrine of assumed duty only provides one method by which to meet that element: it does not provide an independent cause of action. Count X therefore only states one manner by which a fact-finder might find Todd owed Hometown a duty, and therefore might be negligent. Reading it most favorably to RTC, count X simply re-states count VII's professional negligence claim, albeit offering a specific theory regarding duty. Like count VIII, it is stricken as redundant. *See* FED. R.CIV.P. 12(f).

### F. The limitations period.

Todd also challenges counts VII–X as time-barred. The court now takes up that challenge with regard to the remaining two counts: counts VII and IX.

■ FIRREA, as discussed above, sets the appropriate limitations period "with regard to any action brought by the [RTC] as conservator or receiver." *See* 12 U.S.C. § 1821(d)(14). Also as discussed above, § 1821(d)(14) does not revive stale state-law claims: that is, if the limitations period on a state claim has run before RTC is appointed conservator or receiver, RTC may not bring that claim under FIRREA. *See Dawson,* 4 F.3d at 1306–1307 (citing cases in support). Todd claims that RTC's state-law claims were stale when RTC took receivership of Hometown and are therefore time-barred. The court disagrees.

■ The limitations period applicable to calculate whether RTC's professional negligence count was stale when RTC was appointed receiver is two years. *See* IND.CODE § 34-4-19-1 (1993). Likewise, the applicable limitations period for RTC's contract claim is two years. That is because "[t]he substance of the action, rather than its form, determines the applicable statute of limitations." *INB National Bank v. Moran Electric Service, Inc.,* 608 N.E.2d 702, 706 (Ind.Ct.App. 1993). Although framed as a contract claim, count IX is concerned with whether Todd "faithfully, properly and with due care discharge[d] his duties as chief appraiser." Complaint ¶ 105. Thus the substance of count IX is whether Todd performed his contractual duties with due care. The fact that Indiana provides that "one who contracts to perform services may commit both a breach of contract and the tort of negligence when he negligently fails to perform," *Essex,* 446 N.E.2d at 370, does not change the *substance* of this claim from tort to contract. The general negligence limitations period of two years therefore applies. *See* IND.CODE § 34-1-2-2(1) (1993).

These two-year limitations periods would clearly have run out by 1990, when RTC was appointed receiver, had they started running when Todd was advising the board on the appraisals of the five loans, in 1983 and 1984.

Were this the case, counts VII and IX would be stale and RTC's appointment could not revive them. The state-law limitations periods for counts VII and IX did not begin to run, however, until the RTC was appointed receiver on June 8, 1990.

This conclusion is based on the supposition that an Indiana court, faced with the facts in this case, would apply the adverse domination doctrine to toll the statute of limitations until the board was no longer dominated by the defendants in this lawsuit, *i.e.* when RTC was appointed receiver on June 8, 1990. *See Johnson v. Railway Express Agency,* 421 U.S. 454, 463–64, 95 S.Ct. 1716, 1721–22, 44 L.Ed.2d 295 (1975) (tolling rules integral to limitations statutes and when federal court applies state limitations period it must take these rules into account); *Kutsugeras,* 973 F.2d at 1346 (federal court deciding issue governed by state law where no clear state authority must "determine the issues presented . . . as [it] believe[s] the [state] courts would under the circumstances").[6]

■■■■■ The equitable doctrine of adverse domination

> tolls the running of the statute of limitations period where the entity [to whom the cause of action belonged] is controlled by or dominated by wrongdoers. The statute of limitations begins to run again when the wrongdoers lose control of the entity. The rationale behind the adverse domination doctrine is premised upon the principle that officers and directors who have harmed the entity cannot be expected to take legal action against themselves.

*Gallagher,* 800 F.Supp. at 600. The doctrine has been extended to apply even where the defendant does not dominate, or even sit on, the relevant entity's board. *See Resolution Trust Corp. v. Gardner,* 798 F.Supp. 790, 795 (D.D.C.1992) (applying doctrine against outside law firm and citing cases applying doctrine to accountants, stock brokers and lower level employees who were neither officers nor directors). The rationale for this exten-

sion is that "culpable directors and officers" are "unlikely to initiate actions or investigations for fear that such actions will reveal their own wrongdoing." *Id.*

■■■■■ In Indiana, "[a] cause of action accrues and the statute of limitations begins to run when the plaintiff knew or, in the exercise of ordinary diligence, could have discovered that an injury had been sustained as a result of the tortious act of another." *INB National Bank v. Moran Electric Service, Inc.,* 608 N.E.2d 702, 708 (Ind.Ct.App. 1993); *see also Wehling v. Citizens National Bank,* 586 N.E.2d 840, 843 (Ind.1992) (holding that prior "ascertainment" rule in Indiana is identical to "discovery" rule applied in other jurisdictions.) Thus, the limitations period does not run against a plaintiff in Indiana until the plaintiff has reason to know of the negligent act. *Madlem v. Arko,* 592 N.E.2d 686, 687 (Ind.1992) (plaintiff would not know of improper notarization on mortgage until he tried to foreclose).

■■■■■ Applied to corporate entities, such as Hometown, Indiana's discovery rule is no different than adverse domination doctrine. The victim of Todd's alleged negligence is Hometown, the corporate entity. As a corporate entity, Hometown can only "discover" an injury to itself, and act to redress that injury, to the extent that those individuals who control it know of the injury and are willing to act on that knowledge. When, as here, the board of a corporate entity is dominated by those whose own malfeasance might be revealed in the course of litigating a complaint, it follows the entity has not "discovered" the injury to its interests in any meaningful way. Put another way, a corporate "plaintiff" has not discovered alleged negligence until that negligence is discovered by those who can be expected to act to redress the entity's interest. That occurred here on June 8, 1990, when RTC was appointed receiver and wrested control from the board. Compare *Dotlich v. Dotlich,* 475 N.E.2d 331, 341–42 (Ind.Ct.App.1985) (limitations period

6. The parties have cited reams of federal case law, primarily from outside the Seventh Circuit, in which adverse domination is applied as a matter of federal law in FIRREA cases. These cases are informative with regard to the nature of adverse domination. They are not authoritative, however, with regard to the question of whether count VII was stale *under Indiana state law* before RTC was appointed receiver of Hometown.

tolled until wrongful conduct of director of close corporation is disclosed or discovered).

*INB National Bank,* relied upon by Todd, does not require a different result. The Indiana Court of Appeals in that case refused to apply a doctrine of "presidential domination" to excuse the untimely filing of the lawsuit "under the ... circumstances" there. 608 N.E.2d at 707. *INB National Bank* involved a business owned by three siblings in which one brother acted as president and dominated the company's financial affairs. 608 N.E.2d at 704. When that brother died, one remaining sibling and the estate of the third sued the dominating brother's estate for his having misappropriated company funds. *Id.* The plaintiff-siblings had discovered the nature of their cause of action in 1984. *Id.* at 708. They filed suit on behalf of themselves and the company in 1991. *Id.* at 704. The applicable limitations period was six years. *Id.* at 708. The court refused to toll the limitations period for the benefit of the plaintiffs because their own acquiescence in their brother's misconduct contributed to the late filing of the suit. *Id.* at 707. By contrast, RTC, plaintiff in this case, did not acquiesce to Todd's alleged misconduct, and was not in any position to do so. Accepting the allegations of the complaint as true, those in position to know and acquiesce in Todd's negligence have been named as defendants in this action. *INB National Bank* is thus distinguishable from the case at bar.

Because, the limitations period did not begin to run on RTC's claims against Todd until RTC displaced the defendants on June 8, 1990, FIRREA's three-year limitations began running on that day. *See* 12 U.S.C. § 1821(d)(14). As noted, RTC filed its complaint on June 4, 1993. Counts VII and IX are timely.

### III. *Conclusion.*

In conclusion, the court **ORDERS** that counts II and III are hereby dismissed with prejudice. Count I is retained as stating a claim of gross negligence under § 1821(k).

Counts VIII and X are stricken. Counts VII and IX are retained.

**SO ORDERED.**